L. E. Thompson and Ruby Thompson v. Commissioner.
Thompson v. Commissioner
Docket No. 4169-62.
United States Tax Court
T.C. Memo 1971-321; 1971 Tax Ct. Memo LEXIS 10; 30 T.C.M. (CCH) 1383; T.C.M. (RIA) 71321; December 22, 1971, Filed. *10 On their return for the year 1956, petitioners reported income from a certain "Navy Contract" in the amount of $256,135.85. In his notice of deficiency respondent determined that petitioners used an accrual basis of accounting. Respondent further determined that only $6,626.09 of the above amount was includable in petitioners' income for 1956 and that the balance accrued during the years 1953 and 1954 in the respective amounts of $67,774.13 and $181,735.63. Held: Since petitioners failed to prove error, respondent's determination is sustained. Respondent determined in the statutory notice that petitioner's company had an ending inventory in the amount of $4,000 at December 31, 1953. Since petitioner did not report any inventory for his 1953 taxable year, respondent increased his 1953 income by $4,000. Respondent further determined that the company had opening and closing inventories in the total amount of $4,000 for each of the taxable years 1954 through 1956, and thereby denied petitioner certain deductions claimed for inventories in 1954 and 1956. Held, further: Petitioner failed to carry his burden of proof, and respondent's determination is sustained. Held, further: Respondent *11 properly determined that petitioner realized during 1953 an additional $27,189.67 of income representing accounts receivable from certain sales which petitioner failed to report in gross income for that year. Held, further: Respondent's determination that petitioner claimed excessive depreciation deductions in each of the years 1953 through 1956 is sustained because petitioner failed to carry his burden of proof. Held, further: Petitioner's claimed deduction of $15,000 as a consultant fee which he allegedly incurred in 1956 was properly disallowed by respondent. Petitioner failed to prove either that he incurred such a liability during 1956, or that the amount of such liability, if any, was reasonably ascertainable in that year. Petitioner alleged that he incurred an additional interest expense of $3,315 in 1955 which he failed to deduct on his income tax return for that year. Held, further: The additional interest deduction should have been allowed by respondent because that expense accrued but was not deducted by petitioner in that year. Held, further: Respondent's disallowance of a deduction in 1955 for real estate taxes in excess of the amount claimed on petitioner's return *12 for that year is sustained because petitioner failed to prove that the alleged "additional" amount had not been previously claimed and allowed for that taxable year. Held, further: Since petitioner failed to prove that respondent improperly disallowed an expense deduction to the extent of $1,000 in 1955, respondent's determination is sustained. In the statutory notice respondent determined that petitioner made certain erroneous adjustments to a capital account in 1954 and 1956 rather than to certain other accounts during those years. Respondent determined that petitioner's income was understated by virtue of the erroneous adjustments by $4,078.37 and $93.53 in the respective years. Held, further: Since petitioner failed to introduce any evidence regarding these issues, respondent's determination is sustained. Held further: Petitioner is liable for an addition to tax for each of the taxable years 1953 and 1954 under section 294(d)(1)(A), I.R.C. 1939, because he did not prove that his failure to make and file a declaration of estimated tax within the time prescribed was due to reasonable cause and not to willful neglect. Held, further: Since petitioner failed to establish that *13 respondent improperly imposed a five percent negligence penalty for each of the years 1953 and 1954, respondent's determination is sustained. 1384 Loren E. Thompson, pro se, Ring Bldg., Washington, D. C. Robert A. Roberts, for the respondent. HOYT
Memorandum Findings of Fact and Opinion HOYT, Judge: Respondent determined deficiencies and additions to tax for petitioners' taxable years 1953 and 1954 as follows: *13
Additions to the Tax
Deficiencies in
Sec. 294(d)(1)(A)
Sec. 293(a)
Sec. 6653(a)
Year
Income Tax
I.R.C. 1939
I.R.C. 1939
I.R.C. 1954
1953
$18,257.20
$3,447.32
$1,915.18
1954
6,019.14
2,360.15
$1,275.75
The years 1955 and 1956 are not before us here, but because of net operating loss carrybacks, we must decide issues involved in those years also. Since certain issues before us involve L. E. Thompson's sole proprietorship, the terms petitioner or petitioners will hereinafter be used to refer to petitioners, or either of them, and said sole proprietorship. Petitioners did not assign error to *15 certain of the adjustments made in the statutory notice. The issues remaining for our decision are as follows: (1) Whether petitioners employed an accrual basis of accounting and had unreported income from a certain "Navy Contract" during the taxable years 1953 and 1954 in the respective amounts of $67,774.13 and $181,735.63. (2) Did petitioner L. E. Thompson's sole proprietorship, Parkersburg Die and Tool Company's ending inventories for the taxable year 1953 and the beginning and ending inventories of that business for each of the taxable years 1954 through 1956 exceed the sum of $4,000? (3) Whether petitioners realized additional income of $27,189.67 during 1953 representing accounts receivable from certain sales which were not reported in gross income for that year. (4) Whether petitioners' claimed deduction for depreciation was excessive for each of the taxable years 1953, 1954, 1955 and 1956 to the extent of $10,818.44, $5,435.29, $5,470.95, and $2,086.69, respectively. (5) Whether petitioners incurred an allowable deduction during the taxable year 1956 for alleged consultant fee in the alleged amount of $15,000. (6) Whether petitioners are entitled to an additional *16 interest deduction in the amount of $3,315 for the taxable year 1955. (7) Whether petitioners are entitled to an additional deduction for real estate taxes in the amount of $1,876.32 for the taxable year 1955. (8) Whether certain other items of expense which were deducted in 1955 were overstated by petitioners to the extent of $1,000. (9) and (10) Whether petitioners made certain erroneous adjustments to a capital account for the years 1954 and 1956 rather than to certain other accounts such that their income was understated in the respective amounts of $4,078.37 and $93.53 on their returns for those years. (11) Whether petitioners are liable for addition to tax for negligence and for failure to file declarations of estimated tax for the years 1953 and 1954. The issues, insofar as they relate to the years 1955 and 1956, affect the amount of the net operating losses which may be carried back to the years 1953 and 1954. Petitioners did not assign error to the determination for the taxable year 1953 and they were entitled to an additional deduction for accrued expenses in the amount of $8,039.17 and a standard deduction for that year in the amount of $1,000. Petitioners also *17 did not assign error to the determination for 1954 that they were limited to a standard deduction of $1,000 and to exemptions in the total amount of $4,800. Additionally, error was not assigned to the determination that a maximum standard deduction of $1,000 was allowable for the taxable year 1955 and to the determination for the taxable year 1956 that petitioners were entitled to additional deductions for utilities, legal expense, and bad debts in the respective amounts of $584.07, $6,089.70, and $41,154.51. Findings of Fact General and Background Facts Petitioners, Loren E. Thompson and Ruby Thompson, are husband and wife and maintained their legal residence at 1385 Parkersburg, West Virginia, at the time of the filing of the petition in this case. They filed joint Federal income tax returns for each of the taxable years 1953, 1954, 1955 and 1956 with the district director of internal revenue, Parkersburg, West Virginia. During the years in issue and for many years prior thereto, Loren E. Thompson (sometimes hereinafter individually referred to as petitioner or Thompson) operated, as a sole proprietorship, a specialty machine shop known as the Parkersburg Die and Tool *18 Company. On June 30, 1952, Curtis Builders, Inc., of Washington, D.C. and the United States Government (through the Department of the Navy) entered into a contract (Contract No. NOy-71703) under which Curtis Builders, Inc. was to construct, inter alia, two 3,000 foot rocket launchers. That contract provided, in part, as follows: CONTRACT (Lump Sum) (Construction) DEPARTMENT OF THE NAVY BUREAU OF YARDS AND DOCKS * * * CONTRACT FOR CONSTRUCTION THIS CONTRACT, entered into this 30th day of June, 1952, by THE UNITED STATES OF AMERICA, hereinafter called the Government, represented by the contracting officer executing this contract, and Curtis Builders, Inc. a corporation organized and existing under the laws of the State of Delaware of the city of Washington in the District of Columbia hereinafter called the contractor, witnesseth that the parties hereto do mutually agree as follows: ARTICLE 1. Statement of work. - The contractor shall furnish the materials, and perform the work for Two 3000 Foot Rocket Launchers (one for Test and one at Pumpkin Neck) complete and ready for use at Naval Proving Ground, Dahlgren, Virginia. for the consideration of $1,668,700.00 in strict *19 accordance with the specifications, schedules, and drawings, all of which are made a part hereof and designated as follows: Bid Item #1 of Specification No. 33106 and Addenda 1, 2, and 3 thereto. The work shall be commenced 7 July 1952 and shall be completed 29 March 1954. For delay in completion of the work, liquidated damages of $375.00 per calendar day shall be assessed in accordance with Article 11 hereof. The contractor shall furnish a performance bond in the sum of $1,668.700.00 and a payment bond in the sum of $834,350.00. Article 6. - PAYMENT AND RELEASE (a) The Contractor shall be entitled to partial payments hereunder as the work progresses upon the basis of estimates made by the Contracting Officer of the degree of completion. In making such estimates, materials delivered to the site, work done at the Contractor's assembly plant, and preparatory work done by the Contractor may be taken into consideration. (b) The Contractor may submit monthly, or at more frequent intervals, as approved by the Contracting Officer, to the Officer in Charge an itemized request for partial or final payment as the case may be. The Officer in Charge will recommend for the approval of *20 the Contracting Officer an amount which he believes the Contractor is entitled to be paid. Payment shall be made of the amount approved by the Contracting Officer subject to reduction for overpayments or increase for underpayments on preceding payments to the Contractor. The Contracting Officer may in his discretion reserve or withhold a percentage (not exceeding 10 percent) of each payment hereunder until the completion of the work and acceptance thereof by the Government or until such earlier time as he may determine. (c) All material and work covered by partial payments made shall thereupon become the property of the Government, but this provision shall not be construed as relieving the Contractor from the sole responsibility for all materials and work upon which payments have been made or the restoration of any damaged or destroyed work, or as a waiver of the right of the Government to require the fulfillment of all of the terms of the contract. * * * Article 8. - INSPECTION AND TESTING * * * (b) All material and workmanship (if not otherwise designated by the specifications) shall be subject to inspection, examination, and test by Government inspectors at any and all times *21 during manufacture or construction and at any and all places where such manufacture or construction is carried on. The Government shall have the right to reject defective material and workmanship or require its correction. Rejected workmanship shall be satisfactorily corrected, and rejected material shall be satisfactorily replaced with proper material without charge therefor, and the Contractor shall promptly segregate and remove the rejected material from the premises. If 1386 the Contractor fails to proceed at once with the replacement of rejected material and the correction of defective workmanship the Government may, by contract or otherwise, replace such material and correct such workmanship and charge the cost thereof to the Contractor, or may terminate the right of the Contractor to proceed as provided in Article 25. * * * Article 10. - CHANGES AND EXTRAS (a) The Contracting Officer may at any time or times, by a written order, and without notice to the sureties, make changes in the drawings or specifications of this contract and within the general scope thereof. If such changes cause an increase or decrease in the cost of doing the work under this contract, or in the *22 time required for its performance, an equitable adjustment in the pertinent contract terms shall be made as hereinafter provided and the contract shall be modified in writing accordingly. Any claim of the Contractor for such an adjustment must be made in writing to the Officer in Charge within 10 days from the receipt of such change order or within such longer period as may be allowed by the Contracting Officer. If the Officer in Charge considers that such change should result in a decrease in the Contractor's compensation or time for performance or both, he shall so notify the Contractor. In either case, the equitable adjustment shall be made in accordance with the mutual agreement of the parties, provided, however, that if the parties are unable to agree, the Contracting Officer shall determine such equitable adjustment, if any, to be made in the contract terms, and his determination shall be final, subject only to appeal under the terms of Article 16. In making such determination, the Contracting Officer shall, in those instances where the adjustment to be made in compensation is estimated by the Officer in Charge to amount to $10,000 or more, convene, and give full consideration *23 to the report of, an advisory board of three members, consisting of two Government representatives appointed by the Contracting Officer and one representative appointed by the Contractor. This board shall estimate and report to the Contracting Officer the amount of the change in cost, time, or both, resulting from the ordered change. In making such estimate, the estimated cost of additions shall be based upon the estimated actual cost to the Contractor and the estimated cost of deductions shall be based upon the estimated cost to the Contractor as of the time the contract was made. To such cost estimates, 6 percent shall be added by said board to adjust the Contractor's profits. In arriving at the amount of the change in price, if any, allowance may be made at the discretion of the Contracting Officer for overhead and general expenses, plant rental, and other similar items. * * * Article 16. - DISPUTES Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof *24 to the Contractor. Within 30 days from the date of receipt of such copy, the Contractor may appeal by mailing or otherwise furnishing to the Contracting Officer a written appeal addressed to the Secretary and the decision of the Secretary or his duly authorized representative for the hearing of such appeals shall be final and conclusive; Provided, That if no such appeal is taken, the decision of the Contracting Officer shall be final and conclusive. In connection with any appeal proceeding under this clause, the Contractor shall be afforded an opportunity to be heard and to offer evidence in support of its appeal. Pending final decision of a dispute hereunder, the Contractor shall proceed diligently with the performance of the contract and in accordance with the Contracting Officer's decision. * * * Article 36. - ORAL MODIFICATIONS No oral statement of any person whomsoever shall in any manner or degree modify or otherwise affect the terms of this contract and, except as otherwise herein provided, no charge may be made for any extra work or material unless the same has been ordered in writing by the Contracting Officer. * * * The contract also providges generally that if the *25 contract is terminated by the Government either for default in performance or "at the option of the government," that the Government is obligated to pay the prime contractor for the reasonable value of the work performed prior to termination. It further generally provides that in the event of a termination "at the option of the government," and the contractor and the Government's contracting officer cannot agree upon the amount to be paid to the contractor, then the Government is required to pay the contractor's costs plus a fixed percentage of such cost. 1387 On December 30, 1952, Curtis Builders, Inc. and Loren E. Thompson executed a contract pertaining to the aforementioned 3,000-foot rocket launchers. That contract provided, in part, as follows: THIS AGREEMENT, made this 30th day of December 1952 by and between LOREN THOMPSON T/A Parkersburg Die Tool Co. * hereinafter called the Subcontractor and CURTIS BUILDERS INC. hereinafter called the Contractor. *3502-3504 Murdock Avenue - Parkersburg, West Virginia
WITNESSETH, That the Subcontractor and Contractor for the considerations hereinafter named agree as follows: Section 1. The Subcontractor agrees to furnish all material *26 and perform all work as described in Section 2 hereof for * * * 2 - 3000' TEST ROCKET LAUNCHERS AND BATTERY BOMBPROOF BUILDINGS - Contract NOy-71703 for * * * DepARTMENT [DEPARTMENT] OF THE NAVY hereinafter called the Owner, at * * * NAVAL PROVING GROUND, DAHLGREN, VIRGINIA * * * Section 2. The Subcontractor and the Contractor agree that the materials to be furnished and work to be done by the Subcontractor are * * * as follows: Furnish all labor, machines, equipment, shops, tools, insurance, transportation, handling, supervision, paint, set screws, lock nuts, & lock washers necessary to completely fabricate and prime with paint three rocket launcher track assemblies, each assembly approx. 3000 linear feet in length and spare components as described and shown in plans and specifications mentioned in Sec. 1 above. In addition to the track assemblies mentioned above, all material, fabrication and galvanizing required assembly support brackets will be supplied by this subcontractor. All fabrication will be to sizes, shapes and tolerances shown on the contract drawings and/or specifications except where specifically documented modifications to these plans and/or specifications are *27 permitted by the Government. Material as per attached list will be furnished by the Contractor. Transportation of tubing from mill to fabrication points, of all fabricated support brackets and track assemblies to the job sites at or near Dahlgren, Virginia, will be furnished by this Subcontractor. Title to and ownership of all material furnished by Contractor will remain with the Contractor. * * * Section 3. The Subcontractor agrees to complete the several portions and the whole of the work herein sublet by the time or times following: * * * As required by the progress of the job and desired by the Contractor except that all components of the fabricated materials must be delivered to the job site within six months after materials are produced by the mills. Section 4. The Contractor agrees to pay the Subcontractor for the performance of his work the sum of Two Hundreed Forty-nine Thousand Five Hundreed Nine and 75/100 ($249,509.75) in current funds, subject to additions and deductions for changes as may be agreed upon, and to make payments on account thereof in accordance with the following terms: 90% of value of material on job site by 25th day of each month to be paid by the *28 15th day of each month following delivery provided that the Subcontractor submits requisition in duplicate to Contractor's office no later than the 25th day of the month. Balance will be paid within thirty days after completion and acceptance by the owner. END. Section 5. The Contractor and Subcontractor agree to be bound by the terms of the Agreement, the General Conditions, and Specifications as far as applicable to this subcontract, and also by the following provisions: The Subcontractor agrees - (a) To be bound to the Contractor by the terms of The Agreement, General Conditions, Drawings and Specifications, and to assume toward him all the obligations and responsibilities that he, by those documents, assumes toward the Owner. * * * The Contractor agrees - (d) To be bound to the Subcontractor by all the obligations that the Owner assumes to the Contractor under the Agreement, General Conditions, Drawings and Specificatios, and by all the provisions thereof affording remedies and redress to the Contractor from the Owner. * * * The Contractor and the Subcontractor agree that - (0) in the matter of arbitration, their rights and obligations and all procedures shall be *29 analogous to those set forth in this Contract. Nothing in this article shall create any obligation on the part of the Owner to pay to or to see to the payment of any sums to any Subcontractor. Income from "Navy Contract" During the taxable year 1953 and for most of the year 1954, petitioner's company, 1388 Parkersburg Die and Tool Company, was engaged in fabricating tools and machining steel in an effort to produce the rocket lauchers specified in its contract with Curtis Builders, Inc. At some undisclosed time during 1953 the Government changed the design of the project. Curtis E. Muir, the president of Curtis Builders, Inc., was killed in an automobile accident on February 17, 1954. Prior to that date petitioner had several conversations with Muir concerning the action to be taken in the event the Government terminated contract No. NOy-71703. It was agreed at that time that if for any reason the Government should terminate the contract, Muir would request the United States Fidelity and Guaranty Company, who had posted a $1,600,000 performance bond on this project, to pay off petitioner's company in full and then either the bonding company or Muir would employ petitioner *30 to redesign and construct the rocket launcher track assembly. During 1953 and 1954 Curtis Builders, Inc., made a series of loans and advances to the Parkersburg Die and Tool Company to aid the latter in the production of the rocket launcher project. Although the records presented are admittedly incomeplete, it seems clear that most of the loans were made between June 20, 1953 and the end of that year. It is also clear that Curtis Builders, Inc., made "advances" to petitioner's company during 1954 on a weekly basis until October 13, 1954. In December 1953, and pursuant to the subcontract, petitioner's company shipped to the Naval Proving Ground at Dahlgren, Virginia, 717 "cast steel yokes" to be used in the assembly of the rocket launchers. During the period that petitioner's company was working on this project a total of 1,396 yokes (the contract had originally called for 1,390 yokes) were completed and shipped to their designated locations. [1]
*31 Petitioner's company sent an invoice (No. 3405) to Curtis Builders, Inc., with regard to these yokes dated December 14, 1953, which stated in part as follows: 717 - Cast Steel Yokes per Yards and Dock Drawing No. 557131, hot galvanized at $29.75
$21,330.75
The above 717 yokes with one coat of Zinc Chromate Primer at.43 308.31
Total
$21,639.06
The only other invoices disclosed by the record which were sent by petitioner's company concerning this project were dated February 10, 1954, in the amounts of $20,401.68 and $90.54. These invoices were for 676 yokes and 3 yokes, respectively. The ledger which was kept for the Parkersburg Die and Tool Company showed that the balance due Curtis Builders, Inc., on the notes and advances mentioned hereinabove was reduced by the amount of each of the above invoices on the date that the particular invoice was rendered. By November of 1954, the Government realized that the project would not work unless the Government's designs and specifications were substantially revised and additional appropriations were obtained to provide for further work and additional materials for the project. On November 30, 1954, the Government *32 announced its decision to discontinue the project and Curtis Builders, Inc. was formally advised by the Department of the Navy that Contract No. NOy-71703 was terminated as of that date. [2]
On November 30, 1956, Curtis Builders, Inc. , and the petitioner reached a final settlement with regard to the amount due the Parkersburg Die and Tool Company for the materials purchased and the work performed by the latter during 1953 and 1954 on the rocket launcher project. It was agreed that the total amount due petitioner's company in this respect was $256,135.85. However, in determining the net amount of settlement payable directly to petitioner's company, it was agreed that the total amount due should first be reduced by $117,000, which was the total remaining balance of loans and advances made by Curtis Builders to petitioner's company while the latter was working on the project. *33 Secondly, it was agreed that Curtis Builders would directly pay off a loan made by the Small Business 1389 Administration to the petitioner's company to help the latter in the production of the rocket launcher track, together with interest and other expenses in connection with this loan, in the total amount of $65,744.94. [3] After canceling the above $117,000 debt and paying off the petitioner's obligations in connection with the SBA loan, Curtis Builders paid the petitioner the remaining net amount of $73,390.91 On their return for the taxable year 1956, petitioners reported income from "Navy Contracts" in the amount of $256,135.85. It was determined in the respondent's statutory notice that only $6,626.09 of the said sum was includable in petitioners' income for the taxable year 1956 and that the income from the "Navy Contracts" accrued to petitioners during the taxable years 1953 and 1954 in the amounts of $67,774.13 and $181,735.63, respectively. Respondent specifically determined that petitioner's company used an accrual method of accounting for *34 those years. Inventories Parkersburg Die and Tool Company's inventories during the taxable years 1953 through 1956 principally consisted of odd pieces of material, gigs, fixtures and continuing agents all of which were purchased and supplied by former customers and left in petitioner's shop after the customers' jobs were completed. The steel used by petitioner's company in the construction of the rocket launchers was furnished and at all times owned by the Government. Petitioners' return for the taxable year 1953 indicated that Parkersburg Die and Tool Company had neither an opening nor a closing inventory. On Schedule C of their return for the taxable year 1954, petitioners claimed an opening inventory for Parkersburg Die and Tool Company of $26,484.03 and a closing inventory for that year of $19,572.45. Petitioners' return for the taxable year 1955 reflected both an opening and closing inventory of work-in-process for Parkersburg Die and Tool Company of $475,678.86 and an opening and closing raw materials inventory of $19,572.45. On their return for the taxable year 1956, petitioners reflected an opening inventory of work-in-process for Parkersburg Die and Tool Company of *35 $475,678.86 and an opening inventory of raw materials in the amount of $19,572.45. Their return for that year also included an ending inventory of work-inprocess for Parkersburg Die and Tool Company of $6,519.68 and an ending inventory of raw materials in the amount of $16,072.45. Petitioner failed to keep adequate and accurate records regarding inventory during the years in issue. Respondent determined in the statutory notice that Parkersburg Die and Tool Company had an ending inventory of raw materials and work-in-process of $4,000 at December 31, 1953, and increased petitioner's 1953 income by this amount. It was further determined in that statutory notice that Parkersburg Die and Tool Company had opening and closing inventories (including both raw materials and work-in-process) in the total amount of $4,000 for each of the taxable years 1954 through 1956. The result of this determination was to deny deductions for inventory in the amounts of $6,911.58 and $472,659.18 in 1954 and 1956, respectively. Accounts Receivable of $27,189.67 It was determined in the statutory notice that petitioners' reported income for the taxable year 1953 was understated by the sum of $27,189.67, *36 representing certain sales reflected in petitioners' accounts receivable but omitted from their reported receipts. Depreciation On their return for each of the taxable years 1953, 1954, 1955 and 1956, petitioners claimed a deduction for depreciation in the amounts of $16,453.07, $12,862.28, $12,817.28 and $7,000.54, respectively. It was determined in the statutory notice that the claimed deduction for depreciation was excessive for each of the taxable years 1953, 1954, 1955 and 1956 in the respective amounts of $10,818.44, $5,435.29, $5,470.95 and $2,086.69. Consultant Fee On November 9, 1955, Stephen J. Nesbitt and Thelma M. Shields filed a Complaint (Stephen J. Nesbitt and Thelma M. Shields v. Loren E. Thompson, Civil Action No. 4960-55) in the United States District Court for the District of Columbia in which they sought a judgment against Loren E. Thompson on two counts for the aggregate sum of $44,639.70, together with interest and costs. According to that Complaint, the judgment was sought for certain services purportedly rendered the said defendant from November of 1951 through August of 1955 and for 1390 advances or expenditures made on behalf of the said defendant. *37 In a "More Definite Statement" filed by plaintiffs it was alleged that their agreement with defendant was to advise, assist, and act as defendant's agent, when requested by him, with respect to problems of management, administration, and financing arising out of defendant's operation of the latter's company. On May 14, 1956, Thompson filed an Answer and Counterclaim in Civil Action No. 4960-55 in which he: (1) raised the statute of limitations as a defense to a part of the plaintiffs' claim; (2) denied any liability on the grounds that the alleged agreement was not in writing, as required by law; (3) asserted that, in any event, there was a failure of consideration on the part of the said plaintiffs; and (4) alleged that the services purportedly performed by the plaintiffs were at least in part legal services, recovery for which by one other than an attorney would be contrary to public policy and inconsistent with the public interest. Additionally, it was alleged in that Answer and Counterclaim that plaintiff Stephen J. Nesbitt acted negligently, carelessly, recklessly and incompetently in the business affairs of the defendant and that by reason thereof the said defendant suffered *38 and sustained damages to the extent of $365,000. In the prayer to his Answer and Counterclaim, Thompson demanded, inter alia, that judgment be entered against plaintiffs for the sum of $365,000, together with interest and costs. On June 29, 1956, Thompson filed an Amended Answer and Counterclaim in Civil Action No. 4960-55 in which he restated the aforementioned defenses to plaintiffs' Complaint, denied that there had ever been any agreement during the time Nesbitt was performing services as to the amount of compensation Nesbitt was to receive, and again prayed that judgment be entered against plaintiffs in the amount of $365,000. On December 4, 1956, Stephen J. Nesbitt and Thelma M. Shields filed a Motion for Summary Judgment in Civil Action No. 4960-55. The United States District Court for the District of Columbia denied that motion on March 28, 1957. Petitioner Loren E. Thompson was represented in Civil Action No. 4960-55 by an attorney with offices in Parkersburg, West Virginia, and an attorney with offices in Washington, D.C. In February 1957, Thompson conferred with his West Virginia counsel concerning the possible settlement of Civil Action No. 4960-55. It was agreed at *39 that conference that settlement of the case for the sum of $15,000 would be in Thompson's best interest. On February 22, 1957, petitioner's West Virginia lawyer wrote to his Washington counsel advising that if at all possible Thompson would like to settle the matter for the sum of $15,000; however, the Washington counsel was cautioned not to inform plaintiffs of Thompson's intention at that time. On March 14, 1957, Washington counsel for petitioner recommended that Thompson accept, if at all possible, plaintiffs' proposal to settle Civil Action No. 4960-55 for a cash payment of $15,000. On April 29, 1957, and pursuant to an agreement by all the parties, final judgment was entered in Civil Action No. 4960-55. That judgment read in part as follows: ORDERED 1. That judgment be and hereby is entered for plaintiffs, Stephen J. Nesbitt and Thelma M. Shields, against defendant Loren E. Thompson in the total sum of $5,000.00 on Counts I and II of the complaint filed herein, plus interest as provided by law; 2. That judgment be and hereby is entered in favor of plaintiffs, Stephen J. Nesbitt and Thelma M. Shields, against defendant, Loren E. Thompson, on the counterclaim of said defendant *40 filed herein. On their returns for the taxable year 1952 through 1956, petitioners did not claim a deduction for any portion of the alleged consultant fee in the amount of $15,000. In their petition, however, they assigned error to respondent's purported failure to allow a deduction in 1956 for the consultant fee in the claimed amount of $15,000. Interest In the petition error was assigned to respondent's alleged failure to allow petitioner an interest deduction in the amount of $3,315 for the taxable year 1955. It was determined in the statutory notice that the claimed interest deduction was previously claimed and allowed on petitioner's return for the taxable year 1955, and that, therefore, no further deduction could be taken for the sum in issue. On his return for 1955, petitioner deducted $4,680.43 as an interest expense. This amount represented interest at the rate of four percent per year which was paid on the loans and advances to 1391 petitioner aggregating $117,000 made by the prime contractor, Curtis Builders, Inc. Petitioner failed to deduct on his return the interest which accrued during 1955 on the loan of $57,001.15 made by the Small Business Administration *41 in 1954. The "excessive interest cost" on the latter obligation was payable in the amount of six percent each year. The $3,315 in interest which petitioner seeks to deduct in this case represents all, or at least a portion, of the interest which accrued in 1955 on the SBA loan, and therefore represents a deductible interest expense. Real Estate Taxes In the petition error was also assigned to respondent's alleged failure to allow petitioners a deduction for real estate taxes in the amount of $1,876.32 for the taxable year 1955. It was determined in the statutory notice that the claimed deduction for taxes had been previously claimed and allowed on petitioners' return for the taxable year 1955, and that, therefore, no further deduction could be taken for the said sum of $1,876.32. Petitioners have offered no evidence on this issue. Expense of $1,000 It was determined in the statutory notice pertaining to the taxable year 1955 that the petitioners' claimed deduction for an item of expense was excessive to the extent of $1,000. Respondent's notice of deficiency read as follows: It is determined that a credit made to your capital account during 1955 in the amount of $1,000.00 *42 represented a check voided by you and thus properly constituted a decrease in expenses. Income, therefore, is increased by $1,000.00 Error was assigned in the petition to this determination. At the trial of the case, petitioner Loren E. Thompson admittedly did not know what the $1,000 represented, and testified that the "Commissioner may be entirely right" in this adjustment. Miscellaneous Adjustments of $4,078.37 for 1954 It was determined in the statutory notice that during the taxable year 1954 petitioners made certain erroneous adjustments to a capital account rather than to accounts receivable in the amount of $856.38, accounts and notes payable in the amount of $1,166.99 and their bank account in the amount of $2,055. It was further determined in that statutory notice that by reason of these erroneous adjustments petitioners' income for the taxable year 1954 was understated by the sum of $4,078.37. Error was assigned in the petition to this determination. Petitioners, however, have offered no evidence on this issue. Miscellaneous Adjustments of $93.53 for 1956 It was determined in the statutory notice that during the taxable year 1956 petitioners made certain erroneous *43 adjustments to a capital account rather than to their bank account in the amount of $73.73 and the account for Federal unemployment taxes in the amount of $19.80. It was further determined in that statutory notice that by reason of these erroneous adjustments petitioners. income for the taxable year 1956 was understated by the sum of $93.53. Error was assigned in the petition to this determination. The only evidence adduced regarding this issue was petitioner's testimony at the trial of the case that he was not familiar with the adjustments at issue here. Ultimate Findings of Fact Petitioners had unreported income from a certain "Navy Contract" during the taxable years 1953 and 1954 in the repective amounts of $67,774.13 and $181,735.63. Parkersburg Die and Tool Company's ending inventories for the taxable year 1953 and the beginning and ending inventories of that business for each of the taxable years 1954 through 1956 did not exceed the sum of $4,000. Petitioners realized additional income during the taxable year 1953 in the amount of $27,189.67. Petitioners' claimed deduction for depreciation was excessive for each of the taxable years 1953, 1954, 1955 and 1956 to the *44 extent of $10,818.44, $5,435.29, $5,470.95 and $2,086.69, respectively. Petitioners did not incur an allowable deduction during the taxable year 1956 for a claimed consultant fee in the alleged amount of $15,000. Petitioners are entitled to an additional interest deduction in the amount of $3,315 for the taxable year 1955. Petitioners are not entitled to an additional deduction for real estate taxes in the amount of $1,876.32 for the taxable year 1955. Petitioners' claimed expenses were overstated for the taxable year 1955 in the amount of $1,000. 1392 Petitioners' taxable income for the taxable year 1954 was understated by the amount of $4,078.37. Petitioners' taxable income for the taxable year 1956 was understated by the amount of $93.53. Petitioners are liable for the addition to tax under section 294(d)(1)(A) of the Internal Revenue Code of 1939 for failure to file declarations of estimated tax for the taxable years 1953 and 1954 because they did not prove that this failure was due to reasonable cause and not to willful neglect. Petitioners are liable for the addition to tax for negligence for both of the taxable years 1953 and 1954. Opinion 1. Income *45 from Navy Contract. On their return for the taxable year 1956, petitioners reported income from a certain "Navy Contract" in the amount of $256,135.85. It was determined in the statutory notice that only $6,626.09 of the said sum was includable in petitioners' income for the taxable year 1956 and that the balance of the sum of $256,135.85 accrued to petitioners during the taxable years 1953 and 1954 in the respective amounts of $67,774.13 and $181,735.63. Petitioners appear to contend that the income from the "Navy Contract" was not accruable in the determined amounts during the taxable years 1953 and 1954 because (1) they realized a total sum of only $73,390.91 from the "Navy Contract"; (2) they purportedly were on the cash receipts and disbursements method of accounting and, therefore, the income from the contract was taxable to them in 1956, the year of its receipt; and (3) they allegedly did not have an established right to any part of the income during the taxable years 1953 and 1954 and, therefore, such income could not have accrued to them during those years. We cannot agree with petitioner's contentions. Petitioner testified that he received only $73,390.91 for his work *46 on the rocket launchers. He further stated that "this is the only sum of money that should ever be talked about in trying to adjust any losses or income or anything." The record discloses that prior to December 1956, Thompson was indebted to Curtis Builders, Inc., and the Small Business Administration in the respective amounts of $117,000 and $65,744.94. In December 1956, Curtis Builers, Inc., apparently had the funds available for the first time to make a distribution to Thompson of the sum due for his work on the rocket launchers. At that time, Curtis Builders, Inc., offset its loan to Thompson in the amount of $117,000 and paid Thompson's liability to the Small Business Administration and certain other creditors out of the $256,135.85, representing the amount of petitioner's total compensation in 1956. Only the remainder, $73,390.91, was remitted directly to petitioner. Accordingly, even assuming arguendo that Parkersburg Die and Tool Company employed the cash receipts method, which assumption would be contrary to our findings of fact, Thompson would still have realized taxable income to the full extent of $256,135.85. *47 When an individual performs services for a creditor, who in consideration thereof, cancels the debt, the debtor realizes income in the amount of the debt as compensation for his services. Section 1.61-12(a), Income Tax Regs.; see also Bailey v. Commissioner, 103 F. 2d 448 (C.A. 5, 1939). Furthermore, it is well established that a taxpayer receives income as compensation for services when pursuant to a contract with his employer a debt or other obligation to a creditor of the taxpayer is discharged by the employer. Such a transaction is regarded as being the same in substance as if the money had been paid to the taxpayer and he had transmitted it to the creditor. Old Colony Trust Co. v. Commissioner, 279 U.S. 716 (1929); Douglas v. Willcuts, 296 U.S. 1 (1935). We turn now to the question of whether or not petitioner's company used the accrual method of accounting. An accrual basis taxpayer realizes taxable income when the right to *48 receive such income is fixed, notwithstanding the actual date or form of payment. Spring City Foundry Co. v. Commissioner, 292 U.S. 182 (1934). It is respondent's contention that petitioner had a right to part of the $256,135.85 in 1953, another portion in 1954, and the remainder in 1956. Respondent specifically determined in the statutory notice of deficiency that Parkersburg Die and Tool Company employed the accrual method of accounting during the years in question. Petitioner has the burden of proving that his company used some 1393 other method of accounting. R. A. Bryan, 32 T.C. 104 (1959), affd. on this ground but reversed and remanded on another, 281 F. 2d 238 (C.A. 4, 1960); Wm. Fleischaker, Etal., 7 B.T.A. 389 (1927). We think it clear that petitioner has wholly failed to carry his burden. Although we think that it can be reasonably inferred from the petition itself that petitioner used the accrual method of accounting, [4] at the trial he made the conclusory statement that he had employed the cash receipts and disbursements method during the years in question. Thompson, however, admitted throughout the trial *49 that he was unfamiliar with and "confused" by accounting techniques and terminology. He did not introduce any evidence which tended to corroborate his conclusory statement that the cash method was used. In fact, a couple of his statements indicated the contrary. He testified that uncollected sales of his company were totaled at the end of a tax reporting year and "reported as sales." He also testified that a deduction should be allowed in 1956 for a consultant fee in the amount of $15,000 because he "incurred this liability" and the cost "accrued" during that taxable year; the facts are clear that no portion of this amount was paid during 1956. Under these circumstances we think that petitioner has failed to carry his burden of proof, and we must conclude and hold that his company used an accrual basis of accounting during the years in issue as determined by respondent. *50 Under the accrual basis of accounting it is the right to receive and not the actual receipt that determines the inclusion of the amount in gross income. Under the regulations, income is to be included for the taxable year when all events have occurred which fix the right to receive such income and the amount thereof can be determined with reasonable accuracy. Sections 1.446-1 (c)(1)(ii) and 1.451-1(a), Income Tax Regs.[5] In Grorge K. Herman Chevrolet, Inc., 39 T.C. 846 (1963), we stated that "[while] the word 'accuracy' means exactness or precision, when used with 'reasonable' it implies something less than an exact or completely accurate amount." The burden of proof is on the taxpayer to establish that the Commissioner is wrong in his determination of when an item accrued. Permanent Homes Land Co., 27 B.T.A. 142 (1932); Josef C. Patchen [], 27 T.C. 592 (1956), reversed on other grounds 258 F. 2d 544 *51 (C.A. 5, 1958). We think that petitioner has failed to sustain his burden of proof in this regard. Petitioner argues on brief that even if he was on the accrual basis of accounting all of the events had not occurred to fix his right to either the $67,774.13 which respondent included in his income in 1953 or the $181,735.63 included in his 1954 income in the statutory notice of deficiency. We are unable to agree with this contention because no evidence was adduced by petitioner which tended to prove that there were any contingencies or conditions precedent to the fixing of the prime contractor's liability and the petitioner's concomitant right to receive the above-stated amounts of income which respondent determined accruable in 1953 and 1954. We found the terms of the contracts involved herein helpful in reaching our conclusion. Under section 5(a) of the subcontract, petitioner agreed to be bound to the prime contractor by the terms of the "Agreement, General Conditions, Drawings and Specifications" contained in the contract between the prime contractor and the United States Government, and to assume toward the prime contractor all the obligations and responsibilities that the *52 latter assumed by the prime contract toward the Government. In addition, in section 5(d) the prime contractor agreed to be bound to the subcontractor, petitioner herein, by all the obligations that the Government assumed to the prime contractor under the above portions of the prime contract, and by all the provisions thereof affording remedies edies and redress to the prime contractor from the Government. Article 6 of the prime contract, entitled "PAYMENT AND RELEASE," states in part as follows: (a) The Contractor shall be entitled to partial payments hereunder as the work progresses upon the basis of estimates made by the Contracting Officer 1394 of the degree of completion. In making such estimates, materials delivered to the site, work done at the Contractor's assembly plant, and preparatory work done by the Contractor may be taken into consideration. In view of this provision we think that those portions of section 5 of the subcontract mentioned previously demonstrate the likelihood that the petitioner had a right to partial payments as the work progressed during 1953 and 1954, even though actual payment was deferred to a later year. In addition, the subcontract itself *53 provided in section 4 for monthly progress payments in the amount of "90% of value of material on job site." We need not decide whether the latter provision was intended to include payment not only for materials purchased and delivered, but also for work performed at the petitioner's plant on materials furnished by the Government but not yet delivered by petitioner to the Naval Proving Ground at Dahlgren, Virginia, (which was referred to in the subcontract as "the location of the work"). This question was not raised by either party. Furthermore, under either interpretation, the prime contract and the subcontract, when read together, tend to establish that petitioner had a right to progress payments. [6]
*54 Another factor which tends to support the respondent's position is the petitioner's admission that the prime contractor, Curtis Builders, Inc., was satisfied with his performance of the contract as it progressed. In addition, the prime contractor agreed to have the bonding company pay off petitioner's company in full in the event of a termination of the project by the Government. We turn now to the evidence presented by the petitioner in his effort to rebut the presumptive correctness of the respondent's determination. At the trial petitioner stated that it would have been impossible for him to collect his compensation during 1953 and 1954 due to an "agreement" between the prime contractor and the Small Business Administration under which the prime contractor was apparently to have advanced loans to petitioner. No other evidence with respect to this alleged "agreement" was presented. The only fact that is clear is that Curtis Builders did make certain loans and "advances" to petitioner during 1953 and 1954, and did not make any other kind of payment during that period. Although the record is silent regarding this point, it is possible that the prime contractor agreed with SBA *55 to defer payment to petitioner for the performance rendered until completion of the work or until the loan from SBA to petitioner was paid off. However, the mere postponing of the date on which payment is to be made does not, by itself, preclude the earlier accrual of the enforceable right to such payment. Even assuming arguendo that the prime's liability to petitioner was partially subordinated to the indebtedness to SBA (a possibility which was not suggested by either party) this fact would not have caused the liability to be less fixed and binding during 1953 and 1954. United Control Corporation, 38 T.C. 957 (1962); Perkins Land & Lumber Co., 9 B.T.A. 528 (1927). Petitioner also argues on brief that the Government's termination of its contract with the prime contractor for default on November 30, 1954, left petitioner without any rights, and that these rights were not restored to him until the Government rescinded this decision and decided to terminate "for the convenience of the Government." [7] The evidence of record does not support this contention. Petitioner admits that the prime contractor was satisfied with petitioner's performance and that the *56 prime had even agreed to have petitioner fully compensated in the event of a termination by the Government. Furthermore, sections 5(a) and (d) of the subcontract included by general reference those provisions in the prime contract which gave a right to payment of reasonable compensation in the event of termination by default. There is no evidence showing that the prime contractor was not satisfied with petitioner's work at the time of the termination, or 1395 that there was any dispute whatsoever with respect to the amount of compensation which was to be paid to petitioner for work done prior to the termination date. On brief petitioner argues that his "Claim of Right" to payments did not mature until after 1954 when he filed a claim for the amount of his compensation, or until his work product was inspected, or until a detailed audit was made by the Navy Department. He also claims that he had no right to payment until the materials, which the Government had furnished, had been returned, and until the actual funds were transferred *57 from the Government to the prime contractor and then to him as final payment. Neither the subcontract nor those provisions of the prime contract which were incorporated therein by reference made the petitioner's right to compensation in 1953 and 1954 contingent upon any of the above-mentioned events. In fact, there is no evidence of record which would support these contentions by petitioner. Since petitioner has failed to overcome the presumptive correctness of respondent's determination that petitioner had a right to compensation during 1953 and 1954, we must turn now to the question of whether the amounts of income included by respondent for those taxable years could have been determined with reasonable accuracy. At the trial petitioner made the conclusory statement that there would not have been any method of making such a computation during the taxable years and that any attempt to do so would have produced "something purely out of the air." No other evidence was presented with respect to this point. Petitioner made no attempt to explain why the amounts determined to be includable by the respondent could not have been computed with reasonable accuracy. Respondent maintains that *58 they could have been, and petitioner has the burden of proving to the contrary. Petitioner does not appear to question the accuracy of the amounts which respondent included in his 1953 and 1954 income. Nor is there any evidence that any dispute existed between petitioner and the prime contractor over the amount of compensation for work performed prior to the time of the termination by the Government. [8]
We also note that certain changes were made in the design of the project by the Government engineers at some undisclosed time during 1953. We think it likely that these changes altered the contract price by an amount in excess of $10,000. If we were to assume that this was indeed the case, then petitioner would have been entitled to the benefits of article 10 of the prime contract *59 by virtue of sections 5(a) and (d) of the subcontract which incorporated the former provisions by general reference. Article 10 provides that where such changes are made, and the parties to the contract are unable to agree upon an equitable adjustment justment of the contract price, then the amount of compensation would be the estimated costs plus a fixed fee of six percent. These provisions lend further credence to the respondent's position that the amount of petitioner's compensation was determinable with reasonable accuracy during the taxable years. Under the circumstances of the record before us, we think that petitioner has failed to rebut the presumptive correctness of the respondent's determination. We conclude and hold that the respondent properly included $67,774.13 and $181,735.63 as income that accrued in petitioner's taxable years 1953 and 1954, respectively. 2. Inventories. Respondent determined in the statutory notice that petitioner's company had an ending inventory in the amount of $4,000 at December 31, 1953. Since petitioner did not report any inventory for his 1953 taxable year, respondent increased his 1953 income by $4,000. Respondent further determined that *60 the company had opening and closing inventories in the total amount of $4,000 for each of the taxable years 1954 through 1956, and thereby denied petitioner certain deductions claimed for inventories in 1954 and 1956. The $4,000 of inventories determined by respondent included both raw materials and work-in-process. The only evidence which was adduced concerning the raw materials inventory was petitioner's testimony that these materials consisted of scraps of steel and iron, including gigs, fixtures, and continuing agents, all of which were purchased and supplied by former customers and left in petitioner's shop after the customers' jobs were 1396 completed. Petitioner made no attempt to present any evidence to support the valuations of raw material inventory which he claimed on his tax returns, or to rebut the presumptive correctness of the valuations determined by respondent. Petitioner's income tax return for the year 1955 reflected an opening and closing inventory of "work-in-process" in the amount of $475,678.86. The 1953 and 1954 returns did not mention the existence of any work-in-process inventory. On his 1956 return petitioner stated that the work-in-process inventory *61 was $475,678.86 at the beginning of the year and $6,519.68 at the close of the year. At the trial it was apparent that petitioner was uncertain as to the nature of the large deduction for work-in-process inventory claimed on his 1956 income tax return. He testified that he assumed that this amount had something to do with an estimate made by the Small Business Administration and others regarding the value of the work performed during the years in issue, and that the estimate was made to establish records for the purpose of obtaining a settlement with the Government on the rocket launcher project. Inherent in respondent's denial of the claimed inventory deductions in 1956 is the position that all of the costs which petitioner paid or incurred in 1953 and 1954 were actually deducted in the latter years, and that the deduction thereof in 1956 would amount to a double deduction. Petitioner has neither presented any evidence which would indicate that these deductions were not taken in the form of business expenses on his 1953 and 1954 income tax returns, nor has he even taken the position that they were not. The fact that petitioner claimed net losses from his business of $22,120.30 *62 and $95,985.83 in 1953 and 1954, respectively, tends to support the respondent's position. It is entirely possible, if not probable, that these so-called "losses" eventuated only by reason of petitioner's failure to report his income from the rocket launcher project during those years. Moreover, we think it entirely possible that the steel owned by the Government was also included in petitioner's work-in-process inventory. On brief petitioner claimed that this steel, which was admittedly supplied and paid for by the Government, was later "rejected" by the Government but subsequently "salvaged and reworked" by petitioner. There is no credible evidence that this steel ever belonged to petitioner such that it could be properly included in his inventory. In fact, the evidence is to the contrary. [9] Since petitioner did not own the steel, it did not legally constitute part of his inventory. Cf. Gunderson Bros. Engineering Corp. 16 T.C. 118 (1951). *63 We have previously held that computations of inventories based upon estimates are insufficient to overcome the correctness of the Commissioner's determination. Steel or Bronze Piston Ring Corporation, 13 T.C. 636 (1949). Furthermore, for petitioners to sustain an inventory priced at cost or market, the method by which the valuations were reached must be set forth in the record in detail, and the Court is not at liberty to indulge in conjecture. National Mill Supply Co., 23 B.T.A. 1363 (1931), affd. 62 F. 2d 420 (C.A. 7, 1933). At the trial it was clear that Thompson did not understand the principles of accounting for inventory. The only evidence presented with respect to the inventory issue was a few uncorroborated conclusory statements by Thompson. No records were produced relating to inventory, and petitioner even admitted that accurate records were not maintained during the years in issue. Under these circumstances, we think that petitioner has wholly failed to sustain his burden of proof, and we conclude and hold that the respondent's determinations as to the inventory issue must be sustained. 3. Accounts receivable of $27,189.67. *64 It was determined in the statutory notice that petitioner realized an additional $27,189.67 of income during the taxable year 1953 representing accounts receivable from certain sales which petitioner failed to report in his gross income. Petitioner alleged in his petition that the accounts receivable of $27,189.67 were included in his "total receipts" reported in his income tax returns for the years 1953 and 1954. At the trial of the case petitioner 1397 took a different approach and testified that the Parkersburg Die and Tool Company maintained its books and records on the cash basis, and, therefore, the uncollected sum of $27,189.67 was not properly includable in income for the taxable year 1953. On brief petitioner pursued the latter argument and stated that his previous allegation in the petition that any portion of this amount was included by him in his 1953 gross income was erroneous. Since we have already held in our discussion of the issue regarding the income from the "Navy Contract" that petitioner's company used an accrual basis of accounting, we think that respondent's inclusion of the $27,189.67 in petitioner's income for 1953 must be sustained. Although no evidence *65 was presented to show the individual accounts receivable which comprised this total amount, we have no reason to disbelieve the respondent's determination. There is no evidence showing that this amount did not actually accrue in 1953. Accordingly, we hold for the respondent on this issue. 4. Depreciation. On their returns for the taxable years 1953, 1954, 1955 and 1956, petitioners claimed deductions for depreciation in the respective amounts of $16,453.07, $12,862.28, $12,817.28 and $7,000.54. It was determined in the statutory notice that the claimed depreciation deduction for each of the years 1953, 1954, 1955 and 1956 was excessive to the extent of $10,818.44, $5,435.29, $5,470.95 and $2,086.69, respectively. This determination was based upon adjustments to the salvage value of the assets as well as adjustments to petitioner's claimed basis in such assets. The only evidence offered by petitioners on this issue was petitioner Loren E. Thompson's testimony that because of the pressures of work he was purportedly unable to properly maintain and repair the equipment. It is clear that this vague testimony does not establish either the salvage value for the assets or petitioner's *66 proper basis in such assets. Accordingly, petitioner has failed to carry his burden of proof on this issue, and we conclude and hold that respondent's determination must be sustained. Welch v. Helvering, 290 U.S. 111 (1933); Rule 32, Tax Court Rules of Practice.
5. Consultant Fee. The issue for decision here is whether petitioners are entitled to a deduction for the taxable year 1956 in the amount of $15,000 for a consultant fee purportedly incurred by them during that year. No deduction for the consultant fee was claimed by petitioners on their return. However, this issue was raised in a protest filed with respondent prior to the issuance of the statutory notice. In the statutory notice it was held that the additional deduction was not allowable because petitioners failed to show that they incurred such a liability during the taxable year 1956 or that the amount of such liability, if any, was reasonably ascertainable in that year. The record disclosed that Stephen J. Nesbitt filed a Complaint on November 9, 1955, in the United States District Court for the District of Columbia in which he sought a judgment against Thompson for $44,639.70. According to that Complaint, *67 judgment was sought for services rendered Thompson in connection with a number of Government contracts. In an Answer to the Complaint, Thompson not only denied any liability to Stephen J. Nesbitt but also counterclaimed for a judgment in the amount of $365,000, purportedly arising by reason of the alleged negligent and reckless actions of Nesbitt in handling the business affairs of Parkersburg Die and Tool Company. At December 31, 1956, the pleadings reflected that Thompson was still denying any liability in any amount. It further appears that some time in the spring of 1957, that suit was settled by agreement of the parties through entry of a judgment in favor of Nesbitt in the amount of $5,000. Significantly, petitioners do not contend that the consultant fee was paid to Stephen J. Nesbitt during the taxable year 1956. Instead, they argue that the "cost accrued" during the year 1956 and, therefore, such accrual constitutes an allowable deduction in that year. No extended citation of authority would seem to be required for the proposition that no deduction is allowable so long as neither *68 the liability nor the amount thereof is fixed. United States v. Anderson, 269 U.S. 422 (1926); Lucas v. American Code Co., Inc., 280 U.S. 445 (1930); and Dixie Pine Products Co., Inc. v. Commissioner, 320 U.S. 516 (1944). Prior to the spring of 1957, petitioners contested a liability in any amount to Stephen J. Nesbitt. Additionally, it appears that the amount of their liability for the consultant services was fixed in 1957 at $5,000 rather than the claimed amount of $15,000. Since neither the fact nor the 1398 amount of liability was "fixed" prior to December 31, 1956, we must conclude and hold that petitioners are not entitled to the claimed deduction for their taxable year 1956. United States v. Anderson, supra. 6. Interest deduction. In the petition error was assigned to respondent's alleged failure to allow petitioners an additional interest deduction in the amount of $3,315 for the taxable year 1955. It was determined in the statutory notice that the claimed interest deduction was previously claimed and allowed on petitioners' return for the taxable year 1955, and that, therefore, no further deduction could be *69 taken for the sum in issue. We disagree with the respondent and have found that the only interest which petitioner deducted on his 1955 return was the $4,680 representing four percent of the $117,000 in loans made by Curtis Builders, Inc. Petitioner failed to deduct any interest which accrued during 1955 on the $57,001.15 Small Business Administration loan, including a six percent "excessive interest cost." The $3,315 in interest which petitioner seeks to deduct in this case represents all or a part of the interest which accrued in 1955 on the SBA loan. We therefore conclude and hold that this expense represents a proper deduction for 1955, and that the respondent's determination regarding this issue was in error. 7. Real estate taxes. In the petition error was assigned to respondent's alleged failure to allow petitioners an additional deduction for real estate taxes in the amount of $1,876.32 for the taxable year 1955. It was determined in the statutory notice that the claimed deduction for taxes had been previously claimed and allowed on petitioners' return for the taxable year 1955, and that, therefore, no further deduction could be taken for the said sum of $1,876.32. Petitioners *70 have directed no evidence to this issue. Accordingly, for want of proof to show error, we hold that respondent's determination must be sustained. Welch v. Helvering, supra. 8. Expense of $1,000. It was determined in the statutory notice pertaining to the taxable year 1955 that petitioners' claimed deduction for an item of expense was excessive to the extent of $1,000. Error was assigned in the petition to this determination. At the trial of the case, petitioner Loren E. Thompson appeared to concede the adjustment. In any event, petitioners have offered no evidence to sustain their burden on this issue. Accordingly, for want of proof to show error, we also sustain respondent's determination as to this issue. Welch v. Helvering, supra. 9. Miscellaneous adjustments of $4,078.37 for 1954. It was determined in the statutory notice that during the taxable year 1954 petitioners made certain erroneous adjustments to a capital account rather than to accounts receivable in the amount of $856.38, accounts and notes payable in the amount of $1,166.99 and their bank account in the amount of $2,055. It was further determined in that statutory notice that by *71 reason of these erroneous adjustments petitioners' taxable income for the taxable year 1954 was understated by the amount of $4,078.37. Error was assigned in the petition to this determination. Petitioners, however, have offered no evidence on this issue. Accordingly, for want of proof to show error as to this adjustment, respondent's determination must be sustained. Welch v. Helvering, supra. 10. Miscellaneous adjustments of $93.53 for 1956. It was determined in the statutory notice that during the taxable year 1956, petitioners made certain erroneous adjustments to a capital account rather than to their bank account in the amount of $73.73 and Federal unemployment taxes in the amount of $19.80. It was further determined in that statutory notice that by reason of these erroneous adjustments petitioners' income for the taxable year 1956 was understated by the sum of $93.53. Error was assigned in the petition to this determination. Petitioners, however, have offered no evidence on this issue, and therefore respondent's determination must be sustained. Welch v. Helvering, supra. 11. Additions to tax. The respondent determined in the statutory notice *72 that petitioners were liable for the addition to tax for each of the taxable years 1953 and 1954 under section 294(d)(1)(A) of the Internal Revenue Code of 1939. That section provides for an addition to tax in the case of a failure to make and file a declaration of estimated tax within the time prescribed, unless such failure is due to reasonable cause and not to willful neglect. The said petitioners have not submitted evidence directed to this issue. Accordingly, for lack of proof to show error, respondent's determination with respect to this issue must likewise be sustained. Welch v. Helvering, supra.1399 The respondent determined in the statutory notice that the deficiency for the taxable year 1953 and the underpayment of tax for the taxable year 1954 were due, at least in part, to negligence or intentional disregard of rules and regulations. The addition to tax prescribed by section 293(a) of the 1939 Code was asserted for the taxable year 1953 and the addition to tax prescribed by section 6653(a) of the 1954 Code was asserted for the taxable year 1954. These sections provide for a five percent penalty where any part of the deficiency or underpayment is due *73 to negligence or intentional disregard of rules and regulations. Petitioners have offered no credible evidence on this issue. Moreover, we need only point out that petitioners' arbitrary adjustments to inventory, their inadequate and inaccurate records, and their absence of consistence in reporting inventories are factors which clearly establish their negligence. Accordingly, we hold that respondent's determination regarding this issue must be sustained. Welch v. Helvering, supra
Decision will be entered under Rule 50. Footnotes
1. On December 2, 1953, the Government directed the petitioner's company to deliver on or before May 31, 1954, "9300 LF Stainless Steel Launcher Track Assembly and 1390 Steel Castings, number CL-2, all according to drawings and specifications as corrected on their contract number AIA dated December 30, 1952." The Government subsequently amended this directive to extend the delivery date from May 31, 1954, to September 1, 1954.↩
2. Although the Government initially terminated the contract for "default in performance" by Curtis Builders, Inc., this decision was rescinded and the contract was instead terminated "at the option of the Government." The date the Government rescinded its prior termination order is not disclosed of record.↩
3. Although this loan was "approved" by the SBA on December 24, 1953, it was not actually made until the summer of 1954.↩
4. For example, not only did the petition fail to state that the cash receipts basis was used or deny the use of the accrual method, but also alleged that uncollected sales were reported as taxable income and that certain expenses were deductible because they accrued during one or more of the taxable years.↩
5. This is in accord with the rule enunciated by the Supreme Court in Spring City Foundry Co. v. Commissioner, 292 U.S. 182↩ (1934).
6. Although petitioner has not raised the point, we note that the subcontract states that progress payments are to be made "provided that the Subcontractor submits requisition in duplicate to Contractor's office no later than the 25th day of the month." We do not know whether or not such requisition forms were submitted by the subcontractor herein. However, even if they were not, it has been held that the necessity for such action does not represent a condition precedent to the fixing of the right to income, but represents a mere mechanical act to aid in the collection of the income. Dally v. Commissioner, 227 F. 2d 724 (C.A. 9, 1955), affirming 20 T.C. 894↩ (1953).
7. Petitioner is apparently referring to a "termination at the option of the Government," provisions for which are found in the prime contract.↩
8. Petitioner's brief implies that there was a dispute over the amount of compensation to be awarded petitioner for certain undisclosed expenses and storage fees allocable to years after 1954, and perhaps for some interest expenses allocable to 1953 or 1954. Petitioner has not shown that these amounts were not included in the $6,626.09 which respondent determined includable in petitioner's 1956 income.↩
9. Although petitioner admitted at trial that the steel belonged to the Government, he also stated that when the Navy contract was canceled the Government "left some $500,000 worth of their steel in my business. It was just simply stock." This statement does not constitute sufficient proof to establish petitioner's ownership of the steel. Moreover, petitioner admits on brief that the steel eventually had to be returned to the Government.↩