**L. E. THOMPSON, and Ruby Thompson, Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellee.**

**No. 72–2498.**

United States Court of Appeals, Fourth Circuit.

Argued Oct. 3, 1973.

Decided Jan. 9, 1974.

Robert A. Cox, Jr., Richmond, Va. (Hirschler & Fleischer and John W. Lee, III, Richmond, Va., on brief), for appellants.

William M. Brown, Jr., Atty., Tax Div., U. S. Dept. of Justice (Scott P. Crampton, Asst. Atty. Gen., Meyer Rothwacks and Jonathan S. Cohen, Attys., Tax Div., U. S. Dept. of Justice, on brief), for appellee.

Before WINTER, BUTZNER and FIELD, Circuit Judges.

WINTER, Circuit Judge:

The Tax Court decided that the amounts of $67,774.13 and $181,735.63, paid to L. E. Thompson in *1956* in settlement of his claims under his subcontract with Curtis Builders, Inc. (Curtis), which in turn had contracted to build two rocket launchers for the Department of the Navy, accrued and should have been included in the income reported jointly by him and Mrs. Thompson for the years *1953* and *1954*. L. E. Thompson, 30 T.C.M. 1383, ¶ 71,321 P–H Memo TC (1971). We disagree, reverse, and remand for further proceedings.

I.

The facts are fully stated in the Tax Court's memorandum decision and need be only summarized here:

On June 30, 1952, Curtis entered into a contract with the Department of the Navy to construct two rocket launchers for use at the Naval Proving Ground, Dahlgren, Virginia. The work was to be completed by March 29, 1954. Under

the contract, Curtis was entitled to receive partial payments as the work progressed. These progress payments could cover delivered materials, work done at the Contractor's assembly plant, and preparatory work.

Under Article 25 of the prime contract, the government had the right to terminate the agreement, in whole or in part, for default.[1] In the event of such a "default termination," Curtis was entitled to the reasonable value of "work performed which [was] in place at the site on the effective date of termination." [2] While the government had the right to require Curtis to deliver work in progress to another contractor and to require that steps be taken to preserve and protect other property, all at the expense of the government, there was no provision for compensation for non-delivered or preparatory work.

The prime contract also made provision for termination at the option of the government.[3] In the event of such an "option termination," Curtis was entitled to whatever amount it and the government contracting officer agreed upon [4] or, failing agreement, to an amount determined under a complex "cost plus" formula.[5] Under an "option

---

1. Article 25.—Termination for Default

(a) The performance of work under this contract may, subject to the provisions of paragraph (a) of Article 26, be terminated by the Government in accordance with this article in whole, or from time to time, in part, whenever the Contractor shall default in performance, or shall so fail to make progress in the prosecution of the work hereunder as, in the opinion of the Contracting Officer, to endanger performance of this contract in accordance with its terms . . . . Termination of work hereunder shall be effected by delivery to the Contractor of a Default Notice of Termination specifying that termination is for default or failure, the extent to which performance of work under this contract shall be terminated, and the date upon which such termination shall become effective.

2. Article 25.—Termination for Default

(d) Upon termination of work pursuant to this article, the Government, but without duplication of any amounts, shall pay the Contractor the following amounts:

(1) For work performed which is in place at the site on the effective date of termination and for work not terminated by the Default Notice of Termination: The reasonable value thereof (including in the discretion of the Contracting Officer, a fair profit) as determined by agreement of the parties . . . .

3. Article 26.—Termination at the Option of the Government

(a) The performance of work under this contract may be terminated by the Government in accordance with this article in whole, or from time to time, in part, whenever the Contracting Officer shall determine any such termination is for the best interests of the Government . . . .

4. Article 26.—Termination at the Option of the Government

(c) The Contractor and the Contracting Officer may agree upon the whole or any part of the amount or amounts to be paid to the Contractor by reason of the total or partial termination of work pursuant to this Article, which amount or amounts may include a reasonable allowance for profit, and the Contractor and the Contracting Officer may further agree upon the amount or amounts to be paid to the Contractor for the completion of such part of the work as shall not have been terminated by the Notice of Termination, and the Government shall pay the agreed amount or amounts . . . .

5. Article 26.—Termination at the Option of the Government

(d) In the event of the failure of the Contractor and the Contracting Officer to agree as provided in paragraph (c) upon the whole amount to be paid to the Contractor by reason of the termination of work pursuant to this Article or the amount to be paid the Contractor for completing the part of the work not terminated, the Government, but without duplication of any amounts agreed upon in accordance with paragraph (c), shall pay to the Contractor the following amounts:

(1) In respect of all contract work performed prior to the effective date of the Notice of Termination, the total (without duplication of any items) of (i) the cost of such work; (ii) the cost of settling and paying claims arising out of the termination of work under subcontracts or orders . . .; and (iii) a sum equal to 2 percent of the part of the amount determined under subdivision (i) which represents the cost of articles or materials delivered to the site but not incorporated in the work in place on the effective date of

termination" therefore, undelivered products and preparatory work were compensable.

On December 30, 1952, Curtis subcontracted with taxpayer L. E. Thompson, d/b/a Parkersburg Die and Tool Company, to fabricate and furnish three rocket launcher track assemblies, each 3,000 feet in length. The subcontract provided that the prime contractor was "bound to the Subcontractor by all the obligations that the Owner assume[d] to the Contractor under the Agreement, General Conditions, Drawings and Specifications, and by all the provisions thereof affording remedies and redress to the Contractor from the Owner." However, with respect to payment, Curtis and taxpayer did not rely on incorporation of the payment provisions of the original contract. Instead, they agreed that taxpayer would be paid the sum of $249,509.75 for the entire job, with progress payments to be made under the following terms:

> 90% of value of material *on job site* by 25th day of each month to be paid by the 15th day of each month *following delivery* provided that the Subcontractor submits requisition in duplicate to Contractor's office no later than 25th day of the month. Balance will be paid within thirty days after completion and acceptance by the owner. (emphasis added).

Thus, unlike the prime contractor who was entitled to progress payments for preparatory work and undelivered items, taxpayer's right to payment under the subcontract was limited to work delivered to the job site.

From June, 1953 to December, 1953, Curtis made loans to the taxpayer and beginning in January, 1954 and continuing until October, 1954, it made a series of weekly advances. The characterization of these payments is not in question here.

The value of certain cast steel yokes shipped to the job site at Dahlgren, Virginia, by directive of the government, and invoiced by taxpayer to Curtis, were shown on taxpayer's books as reductions in the amount taxpayer owed Curtis on the loans and advances. In this appeal, it is not disputed that the amounts invoiced in 1953 and 1954 were includible in taxpayer's income for those years. Other than these certain cast steel yokes, taxpayer made no other deliveries to the job site.

By letter dated November 30, 1954, Curtis (but *not* taxpayer) was advised that its contract with the government was terminated "effective immediately due to your default in performance." While the Curtis contract was thus terminated, the government instructed taxpayer to continue to perform his subcontract, although it does not appear that the government elected to have Curtis formally assign its rights under the subcontract to the government as was the government's right.[6] Taxpayer protested this directive but was not permitted to discontinue his performance until approximately 70 days after November 30, 1954. It does not appear that Curtis ever took any formal or explicit action to terminate taxpayer's subcontract.

During the next two years, negotiations were carried on by and between Curtis, taxpayer, and the government. The government finally agreed to rescind the termination of Curtis' contract for "default in performance" and "ter-

---

the Notice of Termination, plus a sum equal to 8 percent of the remainder of such amount, but the aggregate of such sums shall not exceed 6 percent of the whole of the amount determined under subdivision (i), which for the purpose of this subdivision (iii) shall exclude any charges for interest on borrowings.

6. Article 25.—Termination for Default
   (b) After receipt of a Default Notice of Termination and except as otherwise direct-

ed by the Contracting Officer, the Contractor shall . . . assign to the Government . . . in the manner and to the extent directed . . . all of the right, title and interest of the Contractor under . . . subcontracts to the extent that they relate to the performance of any work terminated by the Default Notice of Termination; * * *

mination at the option of the government" was substituted.[7] Under the latter, Curtis was entitled to substantial payment and on November 30, 1956, payment by the government was made to Curtis. Of the total payment, $256,135.-85 was paid to Curtis on account of taxpayer's work. From this sum Curtis deducted $117,000.00 due it for loans and advances to taxpayer and paid $65,744.-94 to the Small Business Administration for the principal and interest on a loan made to the taxpayer. Curtis then paid the taxpayer the remainder of $73,390.-91. Taxpayer and his wife reported as income in their joint income tax return for 1956, the $256,135.85 paid in settlement in that year.

Prior to February, 1954, taxpayer and Curtis' president discussed what action they would take in the event the government terminated the contract. They agreed that if the contract was terminated, Curtis' president would request its bonding company to pay taxpayer in full and then either the bonding company or Curtis would employ taxpayer to redesign and construct the rocket launchers. There is no evidence, however, that the bonding company acceded to this agreement, or that the agreement was subsequently carried out.

## II.

The Commissioner's determination that taxpayer followed an accrual method of accounting is unchallenged in this appeal. For accrual method taxpayers, the tax year in which income is includ-

ible is determined under Treasury Regulation § 1.451–1(a), 26 C.F.R. § 1.451–1(a), which sets forth the principles of tax accounting applicable here. That Regulation provides in pertinent part that

> [u]nder an accrual method of accounting, income is includible in gross income when all the events have occurred which fix the right to receive such income and the amount thereof can be determined with reasonable accuracy.

Thus, accrual of income for tax purposes depends on satisfaction of both the "all events" test and the "reasonable accuracy" standard.

Under the facts of this case, we do not think that any part of the payment made to the taxpayer in 1956 accrued in 1953 or 1954. Under the payment terms of the subcontract, taxpayer was entitled to compensation only for work delivered to the job site. Under the subcontract payment provision, taxpayer had no *right* to payment for preparatory work such as the tooling of machines—a major part of his effort in 1953—nor did he have a *right* to payment for partially completed but undelivered work in his Parkersburg, West Virginia, plant. Taxpayer did not accrue a *right* to payment until 1956 when, after two years of strenuous personal effort by the taxpayer and fifty-four meetings, the government was finally persuaded to substitute an "option termination" for the "default termination." [8]

---

7. Article 25.—Termination for Default

(f) This contract shall not be terminated and the Contractor shall not be charged with any liability to the Government under the provisions of this article where the default or failure of the Contractor is due to causes beyond the control and without the fault or negligence of the Contractor, . . . .. In the event that a Default Notice of Termination has been delivered to the Contractor and it is thereafter determined that the default or failure is due to causes beyond the control and without the fault or negligence of the Contractor, performance of work under this contract shall be deemed to have been terminated, . . . pursuant to

Article 26. [option termination] . . . [T]he rights and obligations of the parties shall in such event be governed by Article 26.

8. If, as we hold, taxpayer did not accrue income in 1953 or 1954 under the payment provisions of the subcontract, we perceive no other theory under which it might be said that income accrued in those years:

Termination of the subcontract occurred, either in November, 1954, when the government notified Curtis of the complete termination of the prime contract, or in February, 1955, when the government stated that taxpayer could discontinue performance. If on termination of the Curtis contract an as-

We are unpersuaded by the government's argument that Curtis' statement of its willingness to persuade its bonding company to pay taxpayer if the government terminated the contract requires a different result. There is no evidence that the bonding company received the request, or that if received, it agreed to honor it. It, therefore, cannot be said that taxpayer gained a *right* to receive payment from the bonding company at any time.

Furthermore, we find unconvincing the government's argument that delivery was not a condition precedent to payment because taxpayer was in fact paid without delivery. Taxpayer received payment in 1956 by virtue of the government's substitution of a "termination at the option of the government" for "termination for default." Prior to that time, taxpayer had no right to payment, except for the yokes which were delivered—and for which payment was made.

Finally, we do not accept the alternative position argued by the government that even if delivery was a precondition to payment, it was a mere ministerial act akin to the presentation of a bill and thus no obstacle to the accrual of a right to payment. Under the facts of this contract, it is doubtful that delivery of three rocket launcher track assemblies, each 3,000 feet in length, from Parkersburg, West Virginia, to Dahlgren, Virginia, could be construed as an insignificant part of the consideration bargained for and a mere ministerial duty.

### III.

We have not been asked to review certain other aspects of the tax liability of taxpayers for 1953 and 1954 which were decided by the Tax Court. Some recomputation of that overall liability is in order. We reverse the Tax Court insofar as it included the sums of $67,774.13 and $181,735.63 in taxpayers' taxable income for 1953 and 1954, respectively, and remand the case for recomputation of overall liability for those years.

Reversed and remanded.

signment of taxpayer's subcontract to the government occurred by operation of law, the obstacles which required two years and fifty-four meetings to surmount were in themselves sufficient to prevent the taxpayer's accrual of a right against the government to the settlement eventually made. If no assignment occurred, then taxpayer's only rights were against Curtis. In that case, it is possible that the subcontract's borrowing provision operated to put taxpayer in Curtis' shoes and Curtis in the government's such that taxpayer could request that *Curtis* grant an "option termination" of the *subcontract* because taxpayer was not in default, even though the prime contract was in "default termination." However, it is uncertain (a) whether the borrowing provision would have this effect, (b) whether the Curtis contract grants a court-enforceable right to substitution of "option termination" for "default termination", (c) whether taxpayer's costs under "option termination" could be calculated with reasonable accuracy, (d) whether Curtis had the capacity to pay, and (e) whether Curtis would have paid without litigation. The cumulative effect of these uncertainties is that we could not say that all the events necessary to fix the right to an amount calculable with reasonable accuracy had occurred.

If the subcontract's borrowing provision "passed through" to the taxpayer the benefit of any obligation which the government owed to Curtis, then the taxpayer's derivative right could have accrued no earlier than 1956 when "option termination" was substituted for "default termination" in the Curtis contract. Significantly, this is the construction of the subcontract's borrowing provision which the parties adopted by their conduct.

Of course, it is possible that the borrowing clause did not incorporate the Curtis contract's termination provisions into the subcontract. In that case, taxpayer might have had an action for breach of contract in which he could have sought reliance damages, although these would have been of uncertain magnitude. For tax purposes, taxpayer would not have accrued a right to a reasonably precise amount. See 2 Mertens, Law of Federal Income Taxation, § 1265 (1967) ("Anticipated damages are not accruable in the year of breach or in the year of commencement of litigation, except in the comparatively unusual case where the taxpayer's rights are reasonably certain, the amount is ascertainable and, ordinarily, has been accrued on the taxpayer's books.")